## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                                                    :    Chapter 11

                                                          :

PSL - NORTH AMERICA LLC,                                  :    Case No. 14-_____ (___)

                                                          :

            Debtors.[1]                                   :    (Joint Administration Requested)

------------------------------------------------------- x

## DECLARATION OF BRIAN J. VAILL IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1764, Brian J. Vaill declares as follows under the penalty of perjury:

1.     I am the Chief Executive Officer of PSL - North America LLC ("**PSL NA**"), a limited liability company organized under the laws of the state of Delaware and a partially owned subsidiary of PSL USA INC ("**PSL USA**", together with PSL NA, the "**Debtors**" or the "**Company**"), in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I have served as the Chief Executive Officer of PSL NA since March of 2007, and am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.     As Chief Executive Officer, I am responsible for overseeing the day-to-day operations and financial activities of the Company, including but not limited to, monitoring cash flow, business relationships, workforce issues, and tax and financial planning. As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Company's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' federal tax identification numbers, are PSL - North America LLC (5196) and PSL USA INC (0971). The above-captioned Debtors' mailing address is 13092 Sea Plane Road, Bay St. Louis, MS 39520.

forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.    On June 16, 2014 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their business and manage their properties as debtors in possession subject to the requirements of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**").

4.    I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[2] The Debtors seek the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

---

[2]    Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Motions.

5.     Part I of this First Day Declaration provides an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Motions.

## PART I

### I.     General Background

6.     Founded in 2006, the Company is a premier manufacturer and coater of large diameter steel pipe.  Their products serve a wide range of industries, including the on-shore oil and gas transmission industry, the construction industry and the water industry, in projects throughout the United States and parts of Canada.  The Company is an American-based partially-owned subsidiary of India's largest producer and manufacturer of steel piping, PSL Limited ("**PSL Ltd**").

7.     The Company owns and operates a state-of-the-art facility located in Bay St. Louis, Mississippi (the "**Manufacturing Facility**").  The Manufacturing Facility is located on land leased for 99 years (the "**Facility Lease**") from the Hancock County Port and Harbor Commission.  As of the Petition Date, the Company had approximately 68 full and part-time employees, none of whom are party to any collective bargaining agreements.

### II.     Corporate Structure

8.     Debtor PSL NA is owned by Debtor PSL USA, HSAW Solutions, LLC ("**HSAW**") and Lloyd Systems, Inc. ("**Lloyd**").  Debtor PSL USA owns 83% of PSL NA's membership interests, HSAW[3] owns 9% of PSL NA's membership interests and Lloyd[4] owns 8% of PSL NA's membership interests.  Debtor PSL USA is a wholly owned subsidiary of PSL

---

[3]     HSAW is a privately held Kansas limited liability company.
[4]     Lloyd is a privately held Delaware corporation.

Ltd, a company traded publicly on the Bombay Stock Exchange and National Stock Exchange of India.    An organizational chart depicting the Company's corporate structure is attached hereto as Exhibit A.

## III.    Capital Structure

9.    As of the Petition Date, the Company had total outstanding debt obligations of approximately $130M.    A detailed discussion of the Company's capital structure, including its various debt obligations, is set forth below.

### A.    Debt Structure

10.    The Company currently is a party to the following credit facilities:    (1) PSL NA is the borrower under that certain Loan Agreement, dated as of November 1, 2007 (the "**MBFC Loan**"), entered into with the Mississippi Business Finance Corporation ("**MBFC**"); (2) PSL NA is the applicant under the $77,556,630.14 Second Amended and Restated Credit Facility Letter Agreement, dated as of September 19, 2013 (the "**ICICI Facility**"), entered into with ICICI Bank Limited, New York Branch ("**ICICI**"); and (3) PSL USA is the borrower and PSL NA is the guarantor under that certain $30M Term Loan Agreement, dated as of October 6, 2013 (as amended, the "**SCB Loan**", together with the MBFC Loan and the ICICI Facility, the "**Pre-Petition Credit Facilities**"), with Standard Chartered Bank, Dubai International Financial Centre Branch, as lender ("**SCB**").

### 1.    The "Go Zone" Bonds and the MBFC Loan

11.    Hurricane Katrina was the single costliest hurricane in American history. In response to the devastation caused by the hurricane (which can still be seen today, almost a decade later), the United States Congress passed the Gulf Opportunity Zone Act of 2005 (the "**Go Zone Act**") to spur economic re-development in the Gulf Coast region.    The Go Zone Act,

4

among other things, permits Alabama, Louisiana and Mississippi to issue tax-preferred bonds and provide other tax relief measures to facilitate investment in locations especially hard-hit during recent hurricanes.

12.     On November 1, 2007, the State of Mississippi through the MBFC issued two series of Go Zone Act bonds: (i) Series 2007A Tax Exempt Variable Rate Demand Revenue Bonds, with a face value of $68M, maturing on November 1, 2032; and (ii) Series 2007B Taxable Variable Rate Demand Revenue Bonds, with a face value of $10M, maturing on November 1, 2017 (the "**MBFC Bonds**"). On the same day, the proceeds of the MBFC Bond issuances were loaned to PSL NA pursuant to a loan agreement (the "**MBFC Loan Agreement**") and two notes (the "**MBFC Notes**"). The MBFC Loan's purpose was to finance PSL NA's acquisition, construction and installation of the Manufacturing Facility. The MBFC also entered into a trust indenture agreement (the "**MBFC Indenture**") on November 1, 2007. Under the MBFC Indenture, the MBFC, among other things, conveyed substantially[5] all of its right, title and interest in the MBFC Loan Agreement and the MBFC Notes to Hancock Bank, as the indenture trustee (the "**Trustee**"). The MBFC Bonds are outstanding and the Trustee remains the indenture trustee.

### 2.    The Required Letters of Credit and the ICICI Facility

13.     In connection with the MBFC Loan, PSL NA was required to, among other things, provide a letter of credit to backstop its obligations to service the MBFC Bonds. JP Morgan Chase Bank, N.A. ("**JPM**") issued the initial required letter of credit (the "**JPM LC**"). However, JPM required assurance of PSL NA's ability to reimburse JPM in the event that the

---

[5]     Notwithstanding the MBFC Indenture, the MBFC retained its rights under the MBFC Loan Agreement to make "all determinations and approvals" in the MBFC Loan. Among other things, the MBFC's approval is required before any replacement letters of credit can be issued.

JPM LC was called. PSL NA therefore was required by JPM to post an additional letter of credit to backstop the JPM LC.

14.     PSL NA looked to ICICI to provide such additional letters of credit. On March 4, 2009, PSL NA entered into a master agreement ("**Master Agreement**") with ICICI, whereby ICICI agreed to, from time to time, issue letters of credit at PSL NA's request. As security for the Master Agreement and future letters of credit issued, PSL NA entered into a security agreement with ICICI on March 4, 2009 (the "**ICICI Security Agreement**") for substantially all of PSL NA's personal property. On September 29, 2010, pursuant to a letter agreement, ICICI issued, among other things, an approximately $78M letter of credit to backstop PSL NA's obligation to reimburse JPM if the JPM LC was drawn.

15.     The JP Morgan LC expired on November 1, 2010. Given the Company's obligation to post a letter of credit under the MBFC Loan Agreement and MBFC Indenture, the Company requested that Wells Fargo, NA ("**Wells**") issue a replacement letter of credit (the "**Wells LC**") to replace the JPM LC. On October 29, 2010 Wells replaced JPM as the backstop to the MBFC bonds. Like JPM, Wells required assurance of PSL NA's ability to reimburse Wells in the event the Wells LC was called. Therefore, ICICI and PSL NA entered into an amended letter agreement, whereby ICICI issued a new letter of credit to backstop the Wells LC. ICICI retained its original security interests in PSL NA's personal property. As additional security, ICICI also received a lien on the Facility Lease on October 29, 2010 (the "**Leasehold Mortgage**").

16.     After the Wells LC transaction, the Company used Wells for additional commercial lending purposes. For instance, on August 19, 2011, Wells entered into a $30M revolving credit agreement (the "**Wells Revolver**") with PSL USA, as borrower, and PSL NA, as

6

Guarantor. Among other things, Wells required that the Company post a stand-by letter of credit as security for the Company's obligations under the Wells Revolver. Therefore, PSL NA posted a $30M letter of credit issued by SCB (the "**SCB LC**"). At the closing of the Wells Revolver in 2011, all previously outstanding ICICI letters of credit were extinguished. On that day, PSL NA and ICICI entered into an amended letter agreement under which ICICI, among other things, issued a new $78M letter of credit to backstop the outstanding Wells LC backstopping the MBFC Bonds.

17.    The Wells LC eventually expired, leaving only the ICICI letter of credit outstanding to backstop the MBFC Bonds. Ultimately, ICICI amended and restated all prior facilities and entered into the ICICI Facility on September 19, 2013. Under the ICICI Facility, ICICI provided a single $77,556,630.14 letter of credit to backstop the MBFC bonds, secured by substantially all of PSL NA's personal property and the ICICI Mortgage.

18.    To my knowledge, no ICICI Facility has ever been drawn on by the Trustee. Nevertheless, I have been informed that ICICI has been making certain payments on behalf of the Company to service interest due with respect to the MBFC Bonds.

### 3.    The SCB Facilities and the SCB Loan

19.    As mentioned, the Company applied for and received a letter of credit from SCB in connection with the Wells Revolver. The Company also received credit from SCB on two other occasions: (i) the 2011 SCB Facility (as defined below); and (ii) the SCB Loan.

#### i.    The 2011 SCB Facility

20.    Near the time the Company entered into the Wells Revolver, PSL NA received orders to manufacture pipe for a new pipeline in Texas (the "**Texas Pipeline**"). The Company purchased steel coil to manufacture the pipe from SK Networks ("**SK**"), an overseas

steel supplier for steel coil produced by Hyundai. SK required letters of credit to support PSL NA's obligation to pay for the steel coil. Therefore, in 2011, PSL NA entered into a credit facility (the "**2011 SCB Facility**") with SCB under which SCB agreed to lend up to $50,126,340 to PSL NA. Ultimately, SCB issued letters of credit for the benefit of SK under the 2011 SCB Facility (the "**SK LC**"). PSL NA completed manufacturing the pipe for the Texas Pipeline and paid SK in full in approximately June of 2012, and the 2011 SCB Facility expired on June 30, 2012. To my knowledge, there are no obligations outstanding in connection with the steel coil ordered from SK, the 2011 SCB Facility has expired and the SK LC is no longer issued or outstanding.

### ii.    The SCB Loan

21.    As noted above, SCB initially provided a letter of credit to support the Company's obligations under the Wells Revolver. SCB ultimately replaced Wells under the Wells Revolver and entered into the SCB Loan on October 6, 2013. On January 15, 2014, the Company entered into a security agreement with SCB, whereby the Debtors granted SCB a security interest in substantially all of their personal property.

### 4.    Unsecured Debt

22.    The Company has approximately $4.42M in outstanding unsecured debt evidenced by notes, payable to the Export Import Bank of India for equipment financing, Hanwa American Corporation for a steel coil financing arrangement and CSX Transportation for transportation related financing. The Company also has approximately $13.12M in unpaid, ordinary course trade debt (including approximately $4.8M which is due to PSL Ltd).[6]

---

[6]    Amounts payable to PSL Ltd are due to PSL NA's purchase of certain consumables and equipment from PSL Ltd.

RLF1 10154198v.7

### B.        Equity Interests

23.        As reflected on the corporate organizational chart attached hereto as Exhibit A, PSL USA, HSAW and Lloyd each hold membership interests in PSL NA. PSL NA's membership interests are not traded publicly. Debtor PSL USA is a wholly owned subsidiary of PSL Ltd.

## IV.        Events Leading Up to the Chapter 11 Cases

24.        The confluence of three significant events contributed to the filing of these Chapter 11 Cases: (1) the losses incurred during the Florida Transmission Project (as defined below); (2) macroeconomic market conditions as a result of the recent recession; and (3) PSL Ltd's Indian insolvency proceeding.

### A.        The Florida Transmission Project

25.        Soon after the Company was formed, it received a significant order of steel pipe for a gas transmission project in Alabama and Florida due to enter service in 2011 (the "**Florida Transmission Project**"). The project required approximately 210,000 tons – roughly 450 miles – of steel pipe and promised significant returns on investment.

26.        In 2008, near the all-time record high steel price, PSL NA purchased approximately 240,000 tons[7] of steel coil from F. J. Elsner, ArcellorMittal and Nucor Corporation in preparation for production. F. J. Elsner sourced the steel coil it provided from the Erdimir Group, a Turkish steel company, and delivered it to the Company in the third and fourth quarters of 2008.

---

[7]        Although the Florida Transmission Project required 210,000 tons of steel pipe, PSL NA ordered approximately 240,000 tons because of planned and unplanned steel losses during production. Planned losses are due to crops, milling and sections of pipe that must be removed from the project. Unplanned losses are due to sections of pipe removed from the project for forming, welding or surface defects. Typically, a pipe production project will result in a net loss of approximately 11% of the original amount of steel the project started with.

27.     Production started in late January of 2009.  However, quality problems arose immediately, including unacceptable pipe expansion during hydrotesting[8] beyond permitted variances and poor steel "yield strength" below specified requirements.  As a result, the Company produced only approximately 280 miles worth of pipe that was used on the Florida Transmission Project.  Nearly 80,000 tons – 170 miles – of the order was lost due to the poor quality of the steel coil supplied by F.J. Elsner.

28.     PSL NA conducted an immediate analysis and investigation in an attempt to understand the failures.  This analysis limited operation of the Manufacturing Facility to determine whether the manufacturing process caused the defects; although the Manufacturing Facility was not shut down, production was limited severely.  The analysis and accompanying investigation also was extremely expensive and required a significant cash outlay.  Ultimately, in August of 2009 – after approximately eight months of expert analysis and testing – PSL NA concluded that the F.J. Elsner steel coil was defective upon receipt.[9]

29.     By then, however, the Florida Transmission Project's operators reduced their order from PSL NA and pursued alternative sources of steel pipe for the project's completion.  Ultimately, the Florida Transmission Project was completed in 2010, but PSL NA provided only approximately 130,000 tons of the original 210,000 required.  The Company estimates an approximately $30M negative cash impact due to the defective steel coil that F.J. Elsner delivered.  In my view, the Company has never recovered fully from the losses incurred during the Florida Transmission Project.

---

[8]     Hydrotesting involves pressurizing newly manufactured pipe to ensure the pipe can withstand pressure up to certain specified amounts, subject to permitted variances.

[9]     In 2011, PSL NA commenced litigation against F.J. Elsner in the Commercial Court of Austria in connection with their supply of defective steel.  The litigation is pending.

RLF1 10154198v.7

**B.**     **Macroeconomic Market Conditions**

30.     As the Court is well aware, the global economy suffered greatly during the 2008-2010 recession.   Available credit dried up, resulting in an inability to finance new commercial construction.   The limited credit supply decreased demand for new commercial construction and ultimately demand for new large diameter steel pipe.   Not surprisingly, the recession reduced the Company's revenues and EBITDA significantly.

31.     The Company attempted several price adjustment programs in an effort to remain competitive, but was restricted by the reduced demand for large diameter steel pipe.   As demonstrated by the below table, the Company's revenues and EBITDA have declined relatively consistently year-over-year since operations began in 2009, negatively effecting its ability to service the Pre-Petition Loan Facilities, pursue new business lines and support ordinary course operations.   Additionally, as set forth below, the Company's gross margins and EBITDA have struggled similarly.

| (\$ millions) | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| **Revenue** | \$ 217.4 | \$88.0 | \$61.9 | \$36.7 | 33.6 |
| **EBITDA** | \$12.7 | (\$3.7) | \$5.2 | (\$3.1) | (\$17.2) |
| **Gross Margin** | 4.2% | (0.7%) | 10.7% | (1.8%) | (41.4%) |

**C.**     **PSL Ltd's Insolvency Proceeding**

32.     Though companies struggling financially may look to parent-entities for equity infusions, PSL Ltd, the direct and indirect parent of the Debtors, has recently battled its own credit crisis.   In 2013, PSL Ltd initiated a restructuring of nearly \$900M of debt.   It was not, and currently is not, in a position to fund the Company's operations.   The lack of affiliate support further limited the Company's restructuring options.

RLF1 10154198v.7

D.    **Pre-Petition Restructuring Efforts**

33.    Beginning in late 2012, the Company experienced liquidity issues stemming from reduced revenues caused by, among other things, losses incurred in connection with the Florida Transmission Project and the macroeconomic market conditions. The Company immediately initiated efforts to bring its lenders up to speed on the Company's cash constraints. In September of 2013, ICICI visited the Manufacturing Facility to review operations and to meet with the Company's management about its financial standing.

34.    Though eventual growth in the economy led to growth in the commercial construction sector, the Company's liquidity continued to deteriorate. By early 2014, the Company had significant backlogs of new, cash-flow positive orders for steel pipe. The Company's liquidity constraints, however, nearly eliminated its ability to purchase the steel coil necessary to complete the orders for steel pipe.

35.    Through October 2013, the Company's cash and liquidity position continued to deteriorate. Starting around the same time, the Company began to work tirelessly with ICICI to solve its financial problems. Indeed, since approximately October of 2013, the Company and ICICI have had an ongoing dialogue about the Company's liquidity position, financial prospects and future plans for growth initiatives, and the Company has provided ICICI with significant amounts of information, due diligence and details about the Company's accounts receivable and the Company's intent to enter into the lucrative water transmission pipeline market, a strategic goal of the Company since 2012.

36.    Beginning in late 2013, the Company endeavored to restructure certain of its obligations on its own. First, it entered into various payment accommodations with suppliers and vendors. For instance, the Company was able to enter into a payment plan with CSX

RLF1 10154198v.7

Transportation and was also able to defer payment for equipment purchased from PSL Ltd. Second, the Company negotiated for up-front payment from certain customers for future fulfillment of steel pipe orders. Finally, the Company leaned operations, and reduced costs and workforce operating only with those personnel absolutely necessary to fulfill existing orders. Though these restructuring efforts provided a temporary life-line to the Company, they did not solve its liquidity issues. Further, poor revenue stream and liquidity issues prevented the Debtors from implementing several planned growth initiatives and investment opportunities, including limiting their ability to enter into the lucrative water transmission pipeline market.[10]

37.    Given the accelerating deterioration of the Debtors' financial and operating performance, on March 24, 2014, the Company retained Duff & Phelps Securities, LLC ("**D&P**") as its investment banker and financial advisor to, among other things, (i) advise and assist with respect to cash flow projections and business restructuring plans, (ii) identify and implement short-term and long-term liquidity generating initiatives, (iii) advise the Company in connection with negotiations with secured lenders and key vendors and (iv) assist the company in pursuing both out-of-court and in-court restructuring alternatives, including a potential sale of all or substantially all of the Company's assets.

38.    With the assistance of D&P and Richards, Layton & Finger, P.A. ("**RLF**"), the Company's proposed restructuring counsel, the Company evaluated its hemorrhaging cash flow and weakening operations. Ultimately, the Company determined that its financial position was generally untenable absent additional financing. Thus, the Company immediately commenced efforts to identify proposed lenders willing to fund the Company's operations. Following D&P's extensive efforts to find possible sources of financing, the Debtors

---

[10]    As more fully set forth below, with the funding provided by the DIP Facility (as defined below) and consummation of the transactions contemplated by the Stalking Horse Agreement, the Company anticipates entering the water transmission pipeline market by the first quarter of 2015.

ultimately identified ICICI as the best possible source of funding. Following significant arms'-length and good faith negotiations, ICICI agreed to fund the Company's post-petition operations and investment in the water transmission pipeline market (as described below) through a debtor-in-possession financing facility (the "**DIP Facility**").

V.    **Anticipated Chapter 11 Process**

39.    Following a thorough review of the Debtors' recent and projected financial performance, the Debtors concluded that their forecasted revenue, profitability and liquidity were, and would continue to be, insufficient to adequately fund both the Debtors' business operations and their debt service requirements. As a result, the Debtors, assisted by their professional advisors, commenced a process to explore strategic restructuring alternatives.

40.    After extensive consultation with the Company's restructuring professionals and the Company's diligent evaluation of restructuring options, the Company concluded that commencing a sale process for all or substantially all of the Company's assets was in the Company's best interests. The commencement of these Chapter 11 Cases and the implementation of a Bankruptcy Court supervised sale process, with the assistance of the funding provided by the DIP Facility, will permit the Company to consummate a sale of all or substantially all of their assets and maximize the value of their estates for the benefit of the Company's creditors.

A.    **The Sale Marketing Process and the Water Transmission Pipeline Market**

41.    A significant asset and attribute of the Company is its unique opportunity to enter into the lucrative water transmission pipeline market. With this in mind, the Company, with the assistance of D&P, identified financial and strategic buyers with a potential interest in the Company's assets and entering the water transmission pipeline market. As set forth below,

14

the Stalking Horse Agreement (as defined below) and the DIP Facility are each closely tied to, and assist the Company in financing and investing in, the water transmission pipeline market. With the funding provided by the DIP Facility and the consummation of the transactions contemplated by the Stalking Horse Agreement (as defined below), the Company can add significant value to the estate for the benefit of all creditors.

### 1.    The Water Transmission Pipeline Market

42.    As mentioned, the Company's pre-petition financial standing prohibited it from implementing several planned growth initiatives including, among others, entry into the water transmission pipeline market.  The water transmission pipeline industry involves the production of pipe and pipelines used for the transmission of raw water, drinking water and waste water.

43.    In North America and, specifically the Gulf Coast region, potential significant return on investment exists given that demand for water transmission pipe has been growing (for instance, in 2013, the state of Texas passed "Proposition 6," setting aside roughly $2B for low interest loans for water infrastructure development).  This growth has been driven by the need to both replace aging infrastructure that is nearing the end of its useful life and build new water transmission infrastructure to support the growing populations.  Unlike the oil and gas industry, where a highly fragmented market, over supply of pipe and under-utilization of capacity at pipe mills have led to average supplier gross margins of 2.0% to 4.0%, suppliers of water transmission pipe have achieved gross margins of 20.0% to 30.0%.

44.    Despite the high demand for water transmission pipe, there are a limited number of manufacturers that produce the standard type of pipe required for use in water transmission projects — cement-mortar lined ("**CML**") pipe.  Indeed, the Company estimates

15

that there are currently only four significant manufacturers involved in the roughly $550M water transmission pipeline market.

45.     Though significant barriers to entry exist in the water transmission pipeline market, the Company was and is uniquely positioned to enter the market quickly.  Most importantly, the Manufacturing Facility is conveniently located only approximately 400 miles from current and future major water pipeline projects.  The Company's proximity to various projects and ability to access rail, truck and barge transport directly on-site at the Manufacturing Facility would allow it to fulfill and deliver orders not only more quickly than competitors, but also at a competitive cost.  Given the significant demand but limited supply of CML pipe, various projects have been forced to extend completion horizons.  Thus, the Company had (and continues to have) a unique and significant growth opportunity.

46.     Because the majority of the water transmission pipeline market requires the use of CML pipes, the Company has commissioned the Purchaser, pursuant to a development agreement, to design an expansion to the Manufacturing Facility.  With an approximately $7 million investment (which the Company will fund, in part, with the DIP Facility), the Company expects to be able to commission the new expansion and start producing CML pipe no later than December 2014.

47.     The Company has already identified numerous near-term water transmission projects that it will be able to bid on once it has CML pipe production capabilities. Further, the Company is optimistic that it has positioned itself to be selected as a supplier for, an over 150 mile pipeline (the "**Pipeline Project**"), and anticipates receiving a trial order for 3,000 feet of CML pipe to be delivered to the Pipeline Project in the first quarter of 2015.  With the funding provided by the DIP Facility, the Company anticipates that the modifications to the

16

Manufacturing Facility will be complete in time to fulfill the Pipeline Project order. Thus, the Company's investment in the water transmission pipeline industry (through modifications to the Manufacturing Facility) is expected to be immediately accretive to the value of the estate.

48.     Qualification for the Pipeline Project will not only allow the Company to competitively bid on various sections of the Pipeline Project, but it will also qualify the Company to competitively and credibly bid on other significant future water transmission pipeline projects. The Company believes that becoming a competitive market participant in the water transmission market will maximize the value of its assets by positioning it to substantially increase both the Company's revenues and profit margins.

### 2.     The Stalking Horse Agreement and the Sale Motion

49.     With the assistance of D&P and RLF, the Company began a marketing effort (highlighting the Company's prospects in the water transmission pipeline market) for the sale of substantially all of its assets in approximately April of 2014. D&P assisted the Company in identifying financial and strategic buyers to garner interest in pursuing a sale transaction. Prior to the Petition Date, (i) D&P distributed marketing information to thirty-three (33) financially and strategically interested parties, (ii) the Debtors established an electronic data room whereby interested parties could perform due diligence, subject to execution of an acceptable form of non-disclosure agreement (an "**NDA**") with the Debtors, and (iii) the Debtors executed five (5) NDA's with interested parties.

50.     As a result of the Company's marketing efforts, on June 16, 2014, the Company entered into an asset purchase agreement (the "**Stalking Horse Agreement**") with Jindal Tubular USA LLC (the "**Purchaser**"), pursuant to which the Company will sell substantially all of its assets to the Purchaser in exchange for aggregate consideration of cash and

Assumed Liabilities totaling approximately $100M.[11]  Under the Stalking Horse Agreement, the Purchaser has agreed to act as the stalking horse bidder and to subject the Stalking Horse Agreement to higher and better offers in exchange for certain bidding protections.  The Company, with the assistance of D&P, will continue its marketing efforts post-petition.

51.    The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids.  The Stalking Horse Agreement allows for the Debtors' creditors to benefit from the going concern value of their business, the preservation of jobs, and the assumption and assignment of a substantial numbers of contracts and leases.

52.    The Debtors intend to file a motion (the "**Sale Motion**") on or about the Petition Date seeking, *inter alia*: (i) the entry of an order (a) establishing bidding and auction procedures (the "**Bidding Procedures**") in connection with the sale of the Debtors' assets, (b) approving proposed bid protections, including the payment of a reasonable break-up fee and actual and reasonable out of pocket legal and other fees and expenses, (c) scheduling an auction (the "**Auction**") and setting a date and time for the sale hearing (the "**Sale Hearing**") and (d) establishing procedures for noticing and determining cure amounts for contracts and leases to be assumed and assigned in connection with the sale transaction; and (ii) at the Sale Hearing, subject to the results of the Auction, the entry of an order (a) approving and authorizing a sale to the winning bidder, (b) authorizing the assumption and assignment of certain contracts and leases and (c) authorizing the Debtors to enter into a transition services agreement as contemplated by the Stalking Horse Agreement.

---

[11]    Capitalized terms used herein but not defined shall have the meaning ascribed to such terms in the Stalking Horse Agreement.

18

53.    Consistent with the Stalking Horse Agreement and taking into account the prepetition marketing process discussed above, as well as the need for the Debtors to be able to produce CML pipe by December 2014 to meet the requirements of the Pipeline Project, the Sale Motion proposes the following timeline:

| Event | Deadline |
|---|---|
| Proposed Bidding Procedures Hearing | On or about July 11, 2014 |
| Proposed Bid Deadline | On or about August 11, 2014 |
| Auction | On or about August 13, 2014 |
| Sale Hearing | On or about August 15, 2014 |
| Closing | No later than August 31, 2014 |

54.    The Bidding Procedures, including the proposed timeline, are designed to maximize the value received for the Debtors' assets and to facilitate a fair and open process in which all interested bidders may participate.  Given the Company's prepetition marketing efforts, the Company believes that the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets.  The proposed timeline will provide the Debtors and D&P sufficient time to solicit (and/or re-solicit) prospective purchasers in advance of the Proposed Bid Deadline, while respecting the necessity to consummate a sale as quickly as possible to maximize the value received for the Debtors' Assets.

## PART II

55.    In furtherance of the reorganization of the Debtors through a sale of all or substantially all of the Debtors' assets, the Debtors are seeking approval of the First Day Motions and related orders (the "**Proposed Orders**").

56.    I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enabling the Debtors

to make the transition to, and operate in, chapter 11 with minimum disruption to their business or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

## I.    Motion for Joint Administration of the Debtors' Chapter 11 Cases

57.    The Debtors seek the joint administration of their Chapter 11 Cases, two (2) in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect both Debtors.  Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

## II.    Retention Applications

58.    The Debtors filed a motion (the "**Section 156(c) Application**") contemporaneously herewith to retain Epiq Systems ("**Epiq**"), as claims, noticing, soliciting, and balloting agent pursuant to Sections 105(a), 156(c), and rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and other administrative aspects of chapter 11 cases.  Appointing Epiq as the claims and noticing agent in the Chapter 11 Cases will relieve the administrative burden on the Clerk of the Bankruptcy Court for the District of Delaware (the "**Clerk**").

59.    The Debtors' selection of Epiq to act as the claims and noticing agent has complied with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at

20

least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. The Section 156(c) Application pertains only to the work to be performed by Epiq under the Clerk's delegation of duties permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by Epiq outside of this scope is not covered by the Section 156(c) Application or by any order granting approval thereof. A separate retention application addressing Epiq's services beyond Section 156(c) of the Bankruptcy Code will be filed shortly.

60.     The Debtors also anticipate that they will request permission to retain the following professionals: (a) RLF, as restructuring counsel; and (b) D&P as financial advisor and investment banker. I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts. I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

**III.    Motion Authorizing the Continued Use of the Debtors' Cash Management System**

61.     The Debtors have also filed a motion (the "**Cash Management Motion**"), pursuant to sections 105(a), 345(b) and 363(c) of the Bankruptcy Code, requesting the entry of an order: (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks and business forms; (ii) granting the Debtors a waiver of certain bank accounts and related requirements of the Office of the United States Trustee to the extent that such

requirements are inconsistent with (a) the Debtors' existing practices under the cash management system or (b) any action taken by the Debtors in accordance with any order granting this Motion or any other order entered in the Chapter 11 Cases; and (iii) granting the Debtors additional time to comply with section 345 of the Bankruptcy Code.

62.     In the ordinary course of their businesses, the Debtors maintain a cash management system (the "**Cash Management System**").    The Cash Management System is integral to the operation and administration of the Debtors' business.    The Cash Management System is an ordinary course, customary and essential business practice and allows the Debtors to efficiently identify the Debtors' cash requirements and efficiently monitor and control all of the Debtors' cash receipts and disbursements.    The Cash Management System is similar to those utilized by many other companies of comparable size and complexity to collect, transfer and disburse funds in a cost-effective and efficient manner.

63.     The continued use of the Debtors' Cash Management System during the pendency of the Chapter 11 Cases is essential to the Debtors' business operations and their goal of maximizing value for the benefit of all parties in interest.    Requiring the Debtors to adopt new cash management systems at this early and critical stage would be expensive, impose needless administrative burdens and cause undue disruption.    Any such disruption would adversely affect the Debtors' ability to maximize estate value for the benefit of creditors and other parties in interest.    Moreover, such a disruption would be wholly unnecessary insofar as the Debtors' cash management system provides a valuable and efficient means for the Debtors to address their cash management requirements.    Maintaining the Debtors' existing cash management system without disruption is both essential to the Debtors' ongoing operations and in the best interests of the

22

Debtors, their estates and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use their Cash Management System and bank accounts.

64.     To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtor in possession; provided, however, that in the event the Debtors generate new checks during the pendency of these cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession." Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity of these cases, the press releases issued by the Debtors and additional press coverage. Moreover, the Debtors will provide notice of the commencement of the Chapter 11 Cases to creditors and other parties-in-interest. Changing the Debtors' existing checks, correspondence and other business forms would be expensive, unnecessary and burdensome to the Debtors' estates. Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.

65.     The Debtors believe that the funds held in their bank accounts are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, would be unnecessary and detrimental to the Debtors' estates and creditors. However, the Debtors need time to consult with the United States Trustee in order to determine whether their Cash Management System is currently in compliance with the requirements of section 345(b) of the Bankruptcy Code and/or whether the Debtors need to take any further action to bring their Cash Management System into compliance with the requirements of section 345(b). The

Debtors are therefore requesting a sixty (60) day extension of their time to comply with the requirements of section 345(b) of the Bankruptcy Code.

66.    I believe that the continued operation of the Debtors' Cash Management System is in the best interests of the Debtors' estates and creditors, will avoid immediate and irreparable harm to the Debtors, and is both necessary and appropriate to further the reorganization policy of Chapter 11.

## IV.    **Employee Obligations Motion**

67.    The Debtors have also filed a motion (the "**Employee Obligations Motion**") seeking the entry of an order authorizing them, in their discretion, to pay, continue or otherwise honor various prepetition Workforce-related (as defined below) obligations (collectively, the "**Prepetition Workforce Obligations**") to or for the benefit of their (a) full-time regular employees who are not in a temporary status and who are typically scheduled to work forty (40) to fifty (50) hours per week  (the "**Employees**") and (b) employees who are hired to temporarily supplement the workforce, or to assist in the completion of a specific project (the "**Temporary Employees**"[12], together with the Employees, the "**Workforce**"), for, among other things, (i) compensation to the Workforce, (ii) expense reimbursements to the Employees, and (iii) continuation of benefits provided to the full-time Employees under all plans, programs and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (the foregoing collectively, and as described in greater detail in the Employee Obligations Motion, the "**Workforce Programs**").  In addition, the Debtors request that the Court confirm their right to continue each of the Workforce Programs in the ordinary course of

---

[12]    Nothing contained herein shall constitute an admission by the Debtors that the Temporary Employees are "employees" of the Debtors and the Debtors expressly reserve their right with respect to the proper designation of the Temporary Employees in any context or circumstance.

business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Workforce Program.

68. The Workforce Programs under which the Prepetition Workforce Obligations arise are described more fully the Employee Obligations Motion and include, without limitation, plans, programs, policies and agreements providing for (a) wages, salaries, vacation pay, sick pay and other accrued compensation; (b) reimbursement of business, travel, and other reimbursable expenses; and (c) benefits, with coverage as applicable for eligible spouses, domestic partners and dependents, in the form of medical, dental and vision coverage, coverage continuation under COBRA,[13] basic term life, supplemental life, accidental death and dismemberment, short-term disability, long-term disability, workers' compensation, and miscellaneous other benefits provided to the full-time Employees in the ordinary course of business.[14]

69. The Employee Obligations Motion also seeks authorization to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes and Medicare taxes. In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from Employee paychecks by the Debtors for payments on behalf of Employees for benefit plans, insurance programs and other similar programs, or by

---

[13]   See 29 U.S.C. §§ 1161 et seq.
[14]   The Debtors may separately seek authorization to implement new postpetition retention, severance or similar employment protection programs designed to preserve Employee morale, encourage continuing employment and otherwise ameliorate the effects on Employees of these Chapter 11 Cases. Pending approval of any such postpetition programs, the prepetition programs will continue in the ordinary course, subject to the provisions of Bankruptcy Code Section 503(c)(2).

GTM (as defined in the Employee Obligations Motion) for garnishments, charitable contributions, support payments, and similar items.

70.    The Debtors also request in the Employee Obligations Motion that, with respect to any Workforce Programs and Prepetition Workforce Obligations that are administered, insured or paid through a third-party administrator or provider, the Debtors request authorization, in their discretion, to pay any prepetition claims of such administrator or provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

71.    As of the Petition Date, the Employees included approximately 68 individuals, of which approximately 10 are administrative employees[15] and approximately 58 are direct labor employees[16] who work at the Debtors only facility located in Bay St. Louis, Mississippi.[17] Debtor PSL NA employs all but three (3) of the Employees. Of the three (3) Employees not employed by PSL NA, two are on an L1Visa and the other Employee has a Permanent Resident Card, all three (3) are employed by PSL Ltd., an indirect Parent of PSL NA. PSL NA pays a portion of two (2) of the Employees' salaries and PSL Ltd. pays the remaining portion of the salary directly to such Employees. The third non-PSL NA Employee is provided living expenses of approximately $1,000.00 a month.[18] Additionally, as further detailed in the Employee Obligations Motion, the Workforce includes approximately 9 Temporary Employees.

72.    I believe that the Debtors' ability to preserve their businesses and successfully maximize the value of the estates is dependent on the expertise and continued

---

[15]    Administrative employees consist of non-production related support personnel (i.e. CEO, Finance/Accounting, HR, IT, General Manager, and Sales). These Employees are all exempt and all salaried.
[16]    Direct labor employees consist of Employees directly associated with Production and contain hourly / non-exempt and salaried / exempt employees.
[17]    The Debtors have one (1) Employee who works primarily out of his home in Tulsa, Oklahoma.
[18]    Such Employee will be on the Debtors payroll as of June 23, 2014.

RLF1 10154198v.7

enthusiasm and service of their Workforce. Due to the disruption and uncertainty that typically accompanies a Chapter 11 filing, I believe that the morale and, thus, the performance of the Workforce may be adversely affected. If the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course, their Employees and Temporary Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. In addition, the Debtors have determined that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

**V.     Motion Seeking Relief With Respect to the Debtors' Utilities Companies**

73.     In the Debtors' utilities motion (the "**Utilities Motion**"), the Debtors request entry of interim and final orders approving procedures that would provide adequate assurance of payment to their utility service providers (the "**Utility Companies**") under Bankruptcy Code Section 366, while allowing the Debtors to avoid the threat of imminent termination of electricity, water, and phone and internet services (collectively, the "**Utility Services**") from those Utility Companies. Specifically, the Debtors request entry of interim and final orders (a) approving the Debtors' deposit of $32,631.73 (which is approximately 50% of the estimated monthly cost of the Utility Services based on historical averages over the preceding 12 months) into a newly created, segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code Section 366(b), (b) approving the additional adequate assurance procedures described below as the method for

27

resolving disputes regarding adequate assurance of payment to Utility Companies, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services to or discriminating against the Debtors except as may be permitted by the proposed procedures.

74. As of the Petition Date, I believe that approximately three Utility Companies provide Utility Services to the Debtors at the Manufacturing Facility through approximately three accounts. I have been informed that, on average, prior to the Petition Date, the Debtors spent approximately $65,263.46 each month on utility costs and generally made timely payments of utility costs. As of the Petition Date, the Debtors have unpaid, outstanding balances owed to the Utility Companies of approximately $68,020.44.

75. The Utility Services are crucial to the continued operations of the Debtors' business. I believe that the Debtors could not operate the Manufacturing Facility without the Utility Services. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

76. The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors have proposed certain protections and procedures in the Utilities' Motion.

## VI.    Debtors' Motion to Obtain Post-Petition Secured Financing

77. These Chapter 11 Cases are predicated on the Debtors' sale of substantially all their assets to Jindal. To assist in funding this process, the Debtors engaged in what I believe were vigorous, arm's-length negotiations with ICICI on the terms of the DIP Facility, which I believe is appropriately sized to meet the Debtors' financing needs during this

28

process.   Through this process, the Debtors successfully negotiated the DIP Facility to be provided by ICICI or its designee as postpetition lender (the "**Postpetition Lender**") on terms that I believe are fair and reasonable under the circumstances.

78.    The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility in order to, among other things, finance the ordinary costs of their operations, maintain business relationships with vendors, suppliers and customers, make payroll, make capital expenditures, to satisfy other working capital and operational needs and to assist in the financing of their investment in the water transmission pipeline market.

79.    I believe that the terms of the DIP Facility are fair and reasonable under the circumstances for several reasons.  In particular, the DIP Facility is the result of arm's-length negotiations among ICICI and the Debtors, and contains economic terms, including interest rate and upfront fees, that are below what I believe the Debtors could obtain in comparable financing (if any were available) outside the context of these Chapter 11 Cases.  Based on the foregoing, it is my opinion that the terms of the DIP Facility are fair and reasonable under the circumstances.

80.    I also believe that the Debtors have an immediate need for the use of the interim funds provided by the DIP Facility on an interim basis, and for the use of the total aggregate amount of the DIP Facility following entry of a final order. I do not believe that alternative sources of financing are readily available, if available at all.  In addition, I do not believe it would be possible, much less prudent, for the Debtors to administer these Chapter 11 estates on a "cash collateral" basis. I believe that SCB has a first priority lien on substantially all of their cash collateral, and the Debtors have not reached an agreement with SCB for consensual use of SCB's cash collateral.  Absent access to the DIP Facility, the Debtors would have to rely on non-SCB cash collateral, if any exists, and cash collections not subject to SCB's liens, if any,

29

as discussed in the Debtors' motion to obtain post-petition secured financing.  Accordingly, during the post-petition period, all SCB cash collateral will be held in a segregated account and will not be used absent either SCB's consent or further order of the Court.  I believe that non-SCB cash collateral would be insufficient to fund the Debtors' business, and therefore the DIP Facility is necessary to administer these Chapter 11 Cases.

81.    Because there is simply no viable alternative for the Debtors to maintain operations uninterrupted while facilitating both the sale of substantially all of their assets and their investment in the water transmission pipeline market without the DIP Facility, I believe that the advances thereunder are vital to the preservation and maintenance of the going concern value of the Debtors' estates and to maximize the value of the Debtors' estates for the benefit of all parties in interest.  I further believe that without access to the DIP Facility, to the extent authorized by the Court, the Debtors and their estates would suffer immediate and irreparable harm.

## CONCLUSION

82.    The Debtors' ultimate goal in these Chapter 11 Cases is the going concern sale of substantially all of the Debtors' assets.  In the near term, however, to minimize any loss of value to their business, the Debtors' immediate objective is to maintain ordinary course operations during the early stages of these Chapter 11 Cases, with as little disruption to operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful sale of the Debtors' business will be substantially enhanced.

83.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief

requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

RLF1 10154198v.7

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of June, 2014.

PSL - North America LLC, et al.
*Debtors and Debtors in Possession*

Brian J. Vaill
Chief Executive Officer of PSL - North America LLC

## Exhibit A

**Organizational Chart**

## DEBTORS' ORGANIZATIONAL STRUCTURE

