IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                   :   Chapter 11
                                         :
PSL - NORTH AMERICA LLC,                 :   Case No. 14-_____ (___)
                                         :
            Debtors.¹                    :   (Joint Administration Requested)
------------------------------------------------------- x
```

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, 365, 503 AND 507
AND BANKRUPTCY RULES 2002, 6004 AND 6006 FOR (I) ENTRY OF AN
ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES
RELATED TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS; (B) APPROVING RELATED BID PROTECTIONS; (C) SCHEDULING
AN AUCTION AND SALE HEARING; (D) ESTABLISHING CERTAIN NOTICE
PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY
CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED; AND
(E) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A)
APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS;
(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) APPROVING
THE DEBTORS' ENTRY INTO A TRANSITION SERVICES AGREEMENT**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or

the "**Seller**", as applicable) hereby move, pursuant to sections 105, 363, 365, 503 and 507 of title

11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") and Rules 2002,

6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for

entry of an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto

as **Exhibit A**, (A) establishing bidding and auction procedures (the "**Bidding Procedures**") in

connection with the potential sale of substantially all of the Debtors' assets (the "**Assets**") free

and clear of all claims and any other interests, liens, mortgages, pledges, security interests, rights

of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' federal tax
identification numbers, are PSL - North America LLC (5196) and PSL USA INC (0971).  The above-captioned
Debtors' mailing address is 13092 Sea Plane Road, Bay St. Louis, MS 39520.

"**Interests**"), except to the extent identified in a Winning Bidder's (as defined below) asset purchase agreement; (B) approving the proposed bid protections, including the termination fee (the "**Break-Up Fee**") and expense reimbursement (the "**Expense Reimbursement**," which are defined in the Stalking Horse Agreement (as defined below)) and the Overbid Amount (as defined in the Bidding Procedures) (the Break-Up Fee, Expense Reimbursement and Overbid Amount together, the "**Bid Protections**"), to Jindal Tubular USA LLC (the "**Purchaser**" or the "**Stalking Horse Bidder**", as applicable) in accordance with that certain Asset Purchase Agreement dated as of June 16, 2014 (the "**Stalking Horse Agreement**") for the purchase of the Assets, a copy of which is attached hereto as **Exhibit B**; (C) scheduling an auction (the "**Auction**") and setting a date and time for a sale hearing (the "**Sale Hearing**") for the sale of the Assets (the "**Sale**"), and approving the form and manner of notice thereof; (D) establishing procedures for noticing and determining cure amounts for executory contracts ("**Executory Contracts**") and unexpired nonresidential real property leases ("**Real Property Leases**") to be assumed and assigned in connection with the Sale; and (E) granting certain related relief.

The Debtors further request that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (the "**Sale Order**"), substantially in the form attached hereto as **Exhibit C**, (A) approving and authorizing the Sale, free and clear of all Interests, except to the extent set forth in the Winning Bidder's (as defined below) asset purchase agreement; (B) authorizing the assumption and assignment of certain Executory Contracts and Real Property Leases; and (C) authorizing the Debtors to enter into a transition services agreement as contemplated by the Stalking Horse Agreement. In support hereof, the Debtors respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.[2]

## GENERAL BACKGROUND

2.      On June 16, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Additional information regarding the Debtors' business and the background relating to events leading up to the Chapter 11 Cases can be found in the *Declaration of Brian J. Vaill in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), filed contemporaneously herewith.  As of the date hereof, no trustee, examiner or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

## BACKGROUND ON THE SALE

### A.      Events Leading to the Chapter 11 Filing

3.      Since the Debtors' operations began in 2009, both internal and external factors have contributed to negative trends in the Debtors' revenue and profitability metrics.  The Debtors' sales peaked in  fiscal year 2010, with net sales of approximately $217.4 million, but decreased rapidly to approximately $33.6 million by fiscal year 2014.  The far-reaching impacts

---

[2]      The Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3

of the recent recession, and its corresponding effects on the steel pipe market and commercial construction market at large, was a cause of, and placed significant downward pressure on, the Debtors' profitability and liquidity.

4.        In addition to the macroeconomic market conditions and difficulties faced by the Debtors in recent years, several internal factors contributed to the Debtors' financial difficulties. The Debtors' first order for steel pipe in connection with a gas transmission pipe project in Alabama and Florida (the "**Florida Transmission Project**") for approximately 210,000 tons — 450 miles — of steel pipe promised significant return on investment. However, unexpected quality-issues arose during production of the pipe, eventually resulting in the Debtors scrapping nearly 80,000 tons — 170 miles —of the order due to unacceptable pipe expansion and poor yield strength, each below required specifications. The analyses and investigation that followed to determine the causes of the production failures severely limited the Debtors' production and output. The Debtors' incurred an approximately $30M negative cash impact attributable to the failures associated with the Florida Transmission Project (not including corresponding litigation costs associated with the Debtors' lawsuit against F.J. Elsner in Austrian commercial court based on its delivery of defective steel coil used in the Florida Transmission Project). Additionally, the Debtors' indirect parent company's (PSL Ltd.) recent insolvency proceedings in India limited the Debtors' ability to seek financial support from its parent-affiliate. Though the Debtors attempted to restructure their obligations by negotiating accommodations with various suppliers and vendors, implementing various cost-cutting measures and negotiating with pre-petition lenders, such efforts did not solve their liquidity issues. Finally, declining revenues and liquidity issues have both limited the Debtors' ability to seek and produce new orders and prevented the Debtors from implementing several planned growth initiatives and investment opportunities, including

entry into the lucrative water transmission pipeline market, a strategic goal of the Company since 2012.

5.    As a result of the aforementioned financial and operational difficulties, the Debtors have experienced significant deterioration in revenues, profitability and liquidity since operations began.

| ($ million) | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| Revenue | $ 217.4 | $88.0 | $61.9 | $36.7 | $33.6 |
| EBITDA | $12.7 | ($3.7) | $5.2 | ($3.1) | ($17.2) |
| Gross Margin | 4.2% | (0.7%) | 10.7% | (1.8%) | (41.1%) |

As demonstrated by the above table, the Debtors' revenues are down approximately 85% since operations began in fiscal year 2010. Further, the Debtors' gross margin and EBITDA have declined and were negative each of the two most recent fiscal years.

6.    Given the accelerating deterioration of the Debtors' financial and operating performance, the Debtors engaged Duff & Phelps Securities, LLC ("**D&P**") on March 24, 2014 as their financial advisor and investment banker to, among other things, (i) advise and assist with respect to cash flow projections and business restructuring plans, (ii) identify and implement short-term and long-term liquidity generating initiatives, (iii) advise the Debtors in connection with negotiations with secured lenders and key vendors and (iv) assist the Debtors in pursuing both out-of-court and in-court restructuring alternatives, including a potential sale of all or substantially all of the Debtors' assets.

7.    Following a thorough review of the Debtors' recent and projected financial performance, the Debtors concluded that their forecasted revenue, profitability and liquidity were, and would continue to be, insufficient to adequately fund both the Debtors' business

RLF1 10339783v.4

operations and their debt service requirements.    As a result, the Debtors, assisted by their professional advisors, commenced a process to explore strategic restructuring alternatives.

8.    After extensive consultation with the Debtors' restructuring professionals and the Debtors' diligent evaluation of restructuring options, the Debtors determined that commencing a sale process for all or substantially all of the Debtors' assets was in the Debtors' best interests. In the Debtors' view, the commencement of Chapter 11 Cases and the implementation of a Bankruptcy Court supervised sale process would permit the Debtors to consummate a sale of all or substantially all of their assets and to maximize the value of their estates for the benefit of the Debtors' creditors.

**B.    The Sale Marketing Process and the Water Transmission Pipeline Market**

9.    A significant asset and attribute of the Debtors is their unique opportunity to enter into the lucrative water transmission pipeline market.    With this in mind, the Debtors, with the assistance of D&P, identified financial and strategic buyers with a potential interest in the Debtors' assets and entering the water transmission pipeline market.    As set forth below, the Stalking Horse Agreement is closely tied to the Debtors' investment in the water transmission pipeline market.    With the consummation of the transactions contemplated by the Stalking Horse Agreement (and the assistance of the funding under the debtor in possession financing facility (the "**DIP Facility**") provided by ICICI Bank Limited, New York Branch), the Debtors can add significant value to the estates for the benefit of all creditors.

**1.    The Water Transmission Pipeline Market**

10.    As set forth in the First Day Declaration, the Debtors' pre-petition financial standing prohibited the implementation of several planned growth initiatives including, among

6

others, entry into the water transmission pipeline market.[3] The Debtors' opportunity to enter the water transmission pipeline market is a unique attribute and significant asset of the Debtors.

11.      The Debtors are uniquely positioned to enter the market quickly. Most importantly, the Debtors' state-of-the-art manufacturing facility (the "**Manufacturing Facility**") is conveniently located only approximately 400 miles from current and future major water pipeline projects. The Debtors' proximity to various projects and ability to access rail, truck and barge transport directly on-site at the Manufacturing Facility would allow them to fulfill and deliver orders not only more quickly than most competitors, but also at a competitive cost. Given the significant demand but limited supply of the type of pipe used in such projects (cement-mortar lined pipe, or "**CML**" pipe), various projects have been forced to extend completion horizons. Thus, the Debtors have a unique and significant growth opportunity.

12.      Because the majority of the water transmission pipeline market requires the use of CML pipe, the Debtors have commissioned the Purchaser, pursuant to a Development Agreement,[4] to design an expansion to the Manufacturing Facility. With only an approximately $7 million investment (which the Debtors will fund, in part, with the DIP Facility), the Debtors expect to be able to commission the new expansion and start producing CML pipe no later than December 2014.

13.      The Debtors have already identified numerous near-term water transmission projects that it will be able to bid on once it has CML pipe production capabilities. Further, the Debtors are optimistic that they have positioned themselves to be selected as a supplier for an over 150 mile pipeline (the "**Pipeline Project**"), and anticipate receiving a trial order for 3,000 feet of CML pipe to be delivered to the Pipeline Project in the first quarter of 2015. The Debtors

---

[3]      The water transmission pipeline industry involves the production of pipe and pipelines used for the transmission of raw water, drinking water and waste water.

[4]      A copy of the Development Agreement is attached hereto as **Exhibit D**.

expect the investment in the water transmission pipeline industry to be immediately accretive to the value of their estates.

14.     Qualification for the Pipeline Project will not only allow the Debtors to competitively bid on various sections of the Pipeline Project, but it will also qualify the Debtors to competitively and credibly bid on other significant future water transmission pipeline projects. The Debtors believe that becoming a competitive market participant in the water transmission market will maximize the value of their assets by positioning themselves to substantially increase both revenues and profit margins.

### 2.     The Marketing Process and the Stalking Horse Agreement

15.     With the assistance of D&P and the Debtors' proposed bankruptcy and restructuring counsel, Richards, Layton & Finger, P.A. ("**RLF**"), the Debtors began a marketing effort (highlighting the Debtors' prospects in the water pipe transmission market) for the sale of substantially all of their assets in April, 2014.  D&P assisted the Debtors in identifying potential financial and strategic buyers.   Prior to the Petition Date, (i) D&P distributed marketing information to thirty-three (33) potentially interested parties, (ii) the Debtors established an electronic data room whereby interested parties could perform due diligence, subject to execution of an acceptable form of non-disclosure agreement (an "**NDA**") with the Debtors, and (iii) the Debtors executed five (5) NDA's with interested parties.  With the assistance of D&P and RLF, the Debtors will continue to market their assets post-petition to potential strategic and financial bidders.

16.     As a result of the Debtors' marketing efforts, on June 16, 2014, the Debtors and the Purchaser, which is a Delaware limited liability company and direct subsidiary of Jindal SAW Ltd., one of the largest producers of steel pipe in the United States and India, entered into

8

the Stalking Horse Agreement whereby the Purchaser agreed to purchase substantially all of the Debtors' assets for an aggregate purchase price of $100,000,000.[5]   The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids for the Assets through an auction process.

**C.**   **Proposed Timeline for Sale of Assets**

17.   Pursuant to Section 4.4 of the Stalking Horse Agreement, the Purchaser may terminate the Stalking Horse Agreement if (a) the Bidding Procedures Order shall not have been entered within twenty-five (25) days of the Effective Date, (b) the Sale Order shall not have been entered by the Bankruptcy Court and become a final order by eighty-five (85) days after the Petition Date or (c) the Closing shall not have occurred by August 31, 2014.

18.   Consistent with these requirements, the Debtors propose the following timeline for conducting the sale process:

| Event | Deadline |
|---|---|
| Proposed Bidding Procedures Hearing | On or about July 11, 2014 |
| Proposed Bid Deadline | On or about August 11, 2014 |
| Auction | On or about August 13, 2014 |
| Sale Hearing | On or about August 15, 2014 |
| Closing | No later than August 31, 2014 |

19.   Given their prepetition marketing efforts, the Debtors believe that the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets.   The proposed timeline will provide the Debtors and D&P sufficient time to solicit (and/or re-solicit) prospective purchasers in advance of the Proposed Bid

---

[5]   Capitalized terms used herein but not defined shall have the meaning ascribed to such terms in the Stalking Horse Agreement.

RLF1 10339783v.4

Deadline, while respecting the necessity to consummate a sale as quickly as possible to maximize the value received for the Debtors' Assets.

**D.      Terms of the Stalking Horse Agreement**

20.      A summary of the pertinent terms of the Stalking Horse Agreement, including the terms to be highlighted pursuant to Local Rule 6004-1, is as follows:[6]

- **Assets**: Section 2.1 of the Stalking Horse Agreement lists the Purchased Assets. As set forth therein, the Purchaser will acquire substantially all of the Debtors' assets including, among other things: (a) all buildings, structures, improvements and other interests owned by the Debtors located on any Real Property leased to the Debtors; (b) the Machinery, Fixtures and Equipment; (c) Inventory, including raw supplies, work-in-process and finished goods; (d) notes and accounts receivable; (e) Purchased Contracts and all of the Debtors' rights thereunder; (f) the Purchased Intellectual Property; (g) all Books and Records relating to the Purchased Assets or Assumed Liabilities; and (h) all Permits held by the Debtors that are owned, used or held in connection with the Purchased Assets.

- **Assumed Liabilities**: As set forth in Section 2.3 of the Stalking Horse Agreement, the liabilities to be assumed by the Purchaser include, among other things, certain obligations and liabilities primarily relating to the Sellers' Business, including (i) all of the Debtors' obligations under the approximately $76.8M in outstanding tax-exempt and taxable variable rate demand revenue bonds (the "**Bonds**") issued by the Mississippi Business Bank Finance Corporation.

- **Purchase Price**: Section 3.1 of the Stalking Horse Agreement provides that the Purchase Price for the Purchased Assets will be $100,000,000 which shall be reflected by (a) Purchaser's assumption of Seller's Liabilities under the Bond Documents plus (b) an amount in cash equal to the amount by which $100,000,000 exceeds the Bond Obligations. Of the Cash Purchase Price, Purchaser shall pay an amount directly to Duff & Phelps Securities, LLC, equal to the Success Fee, as defined in the Stalking Horse Agreement, not to exceed $2,200,000.

---

[6]      The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Agreement.

RLF1 10339783v.4

- **Termination and Other Deadlines**: Section 4.4 of the Stalking Horse Agreement sets forth circumstances under which the Stalking Horse Agreement may be terminated. Among other things, the provision allows the Purchaser to terminate the Stalking Horse Agreement if: (i) the Closing has not occurred by August 31, 2014; (ii) the Sale Order has not been entered and become a final order by eighty-five (85) days after the Petition Date; or (iii) the Bidding Procedures Order has not been entered by twenty five (25) days after the Petition Date.

- **Break-Up Fee, Purchaser Expense Reimbursement Amount and Overbid Protection**: Section 4.6 of the Stalking Horse Agreement provides for a Termination Fee of $3,000,000 plus Expense Reimbursement not to exceed $ 500,000. Pursuant to the Bid Procedures Order and Sale Order, the Termination Fee shall have administrative expense priority obligations pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Section 503(b) and 507(b) of the Bankruptcy Code. In the event that the Termination Fee and Expense Reimbursement become due, the amounts shall be payable directly to the Purchaser.

- **Closing Conditions**. The respective obligations of the Purchaser and the Sellers to consummate the closing of the transactions contemplated by the Stalking Horse Agreement are subject to the satisfaction or waiver of the closing conditions set forth in Article X of the Asset Purchase Agreement.

- **Transition Services Agreement**. As set forth in Sections 4.2 and 4.3 of the Stalking Horse Agreement, it is a condition to closing that the Sellers and the Purchaser enter into a Transition Services Agreement pursuant to which certain transitional services will be provided to Purchaser in connection with the operation of the Business.

- **Good Faith Deposit**. Pursuant to Section 3.2 of the Stalking Horse Agreement, the Purchaser is required to deposit $3,000,000, either in cash or in an acceptable irrevocable standby letter of credit issued by a financial institution acceptable to Seller, as a deposit that will constitute liquidated damages should the Purchaser breach the Stalking Horse Agreement or its related agreements.

- **Sale of Avoidance Actions.** Pursuant to Section 2.1, all causes of action under Section 547 of the Bankruptcy Code will be conveyed to the Purchaser who agrees to not pursue, transfer or convey any such causes of action.

- **Sale Free and Clear of Unexpired Leases**: Paragraphs R, S, U, 8 and 16 of the Sale Order provide that on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, liabilities

and Encumbrances of, against or created by Sellers or their bankruptcy estates, will be fully released from and with respect to the Purchased Assets, which shall be transferred to Purchaser free and clear of all obligations, liabilities and Encumbrances except for Assumed Liabilities and Permitted Encumbrances. The Sale Motion will be deemed to provide sufficient notice as to the sale and assignment of the Purchased Assets free and clear of all Liens and Excluded Liabilities in accordance with Local Rule 6004-1. Following the Closing, no holder of any Lien on the Purchased Assets may interfere with the Purchaser's use and enjoyment of the Purchased Assets based on or related to such Lien, or any actions that the Debtors may take in their chapter 11 cases and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions or by this Order.

- **Record Retention**: Section 8.7 of the Stalking Horse Agreement provides that each of Seller and Purchaser agree to preserve and keep the records, or in the case of Seller, arrange for the preservation and keeping of the records, held by it or their Affiliates relating to the Purchased Assets for a period of six (6) years from the Closing Date, and shall make such records and personnel available to the other Party as may be reasonably required by such Party in connection with, among other things, any insurance claims, Legal Proceedings or Tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with its obligations under this Agreement, as applicable and each other agreement, document or instrument contemplated hereby or thereby

- **No Successor Liability**: Paragraph 26 of the Sale Order provides that the Purchaser and its affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities assumed under or pursuant to the Stalking Horse Agreement.

- **Relief From Bankruptcy Rule 6004(h)**: Paragraph 39 of the Sale Order provides that the Sale Order will be effective and enforceable immediately upon entry and its provisions will be self-executing.

21.    As discussed above, the Stalking Horse Agreement contemplates a going concern sale of the Debtors' Assets with certain Executory Contracts and Real Property Leases being assumed and assigned to the Purchaser on the Closing Date.

RLF1 10339783v.4

## RELIEF REQUESTED

22.     By this Motion, the Debtors seek entry of the Bidding Procedures Order: (A) approving the Bidding Procedures; (B) approving the Bid Protections in accordance with the Stalking Horse Agreement; (C) scheduling the Auction and a Sale Hearing with respect to any bid accepted by the Debtors, and approving the form and manner of notice thereof; and (D) establishing the Cure Procedures (as defined below).

23.     The Debtors also request that this Court set a Sale Hearing on or about August 15, 2014. At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of a Sale Order (A) approving the Sale, free and clear of all Interests, (B) authorizing the assumption and assignment of certain Executory Contracts and Real Property Leases and (C) authorizing the Debtors to enter into a transition services agreement as contemplated by the Stalking Horse Agreement.

## BASIS FOR RELIEF

### A.     Necessity for Sale

24.     After critical analyses, the Debtors concluded that their forecasted revenues were insufficient to adequately fund both the Debtors' business operations and their debt service requirements. Thus, following consultation with their advisors, the Debtors determined that, given their leveraged financial position, their diminishing revenue stream and their conclusions about the valuation of the Debtors' business, the most effective way to preserve the Debtors' going concern value for the benefit of creditors was through a sale of the Debtors' assets following a thorough marketing process.

25.     The Debtors submit that a Sale of the Assets, along the timeline proposed herein, will adequately address their liquidity issues by transferring ownership of the business as a going concern to a financially stable buyer that will be able to satisfy the company's capital needs

13

while also maximizing the value of the Debtors' estates for the benefit of all creditors by, among other things, facilitating entry into the water transmission pipeline market. Addressing the Debtors' capital concerns will also help maintain confidence among their customer base, thereby decreasing the chance of any loss of customers. Accordingly, the Debtors have decided to pursue the Sale of the Assets and believe that they must be permitted to conduct the process in the manner and along the timeline set forth herein and in the Bidding Procedures. In the absence of a sale transaction conducted in accordance with such timeline, the Debtors may not have sufficient liquidity to maintain operations going forward, will likely face deterioration in the value of the business and may be unable to continue operations, potentially leading to Chapter 7 bankruptcy filings.

**B.      The Bidding Procedures**[7]

26.      In order to maximize the value of the Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery. As described more fully in the Bidding Procedures, attached as **Schedule 1** to the Bidding Procedures Order attached hereto as **Exhibit A**, the Debtors may sell all of the Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets.

27.      As described more fully in the Bidding Procedures, the Debtors propose that competing bids for the Assets be governed by the following procedures:[8]

- **Bid Deadline**. Any party interested in submitting a bid must transmit such bid to the parties identified on Schedule 1 attached to the Bidding Procedures not later

---

[7]      Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached as **Schedule 1** to the Bidding Procedures Order.

[8]      The following description of the Bidding Procedures is only a summary of the terms set forth in the Bidding Procedures attached as **Schedule 1** to the Bidding Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall control.

than 5:00 p.m. (prevailing Eastern Time) on August 11, 2014 (the "**Bid Deadline**").

- **Required Bid Materials**. All bids, other than that of the Stalking Horse Bidder, must include the following, among other things (the "**Required Bid Materials**"):

    (i)    **Identification of Potential Bidder**. Identification of the party submitting the bid (the "**Potential Bidder**") (and any equity holders, in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction) and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

    (ii)   **Asset Purchase Agreement**. An executed copy of an asset purchase agreement providing for the purchase of substantially all of the assets of the Debtors. Such asset purchase agreement should be substantially in the form of the Stalking Horse Agreement along with a redline marked against the Stalking Horse Agreement reflecting variations from the Stalking Horse Agreement;

    (iii)  **Financing**. Evidence of the Potential Bidder's ability to consummate the transaction and payment of the purchase price in cash at the Closing, including, but not limited to:

        (a)    a signed commitment for any debt or equity financing;

        (b)    a bank or other account statement showing the ability of a Potential Bidder to pay cash for the Assets;

        (c)    contact names and numbers for verification of financing sources; and

        (d)    current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement, acceptable to the Debtors), of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder;

    (iv)   **Minimum Bid Amount**. The bid must be higher or better than the offer of the Purchaser under the Stalking Horse Agreement. To be higher or better than the Purchase Price set forth in the Stalking Horse Agreement, such bid must be, at a minimum, greater than the sum of (A) the consideration set forth in Section 3.1 of the Stalking Horse Agreement, including the Success Fee due Duff & Phelps Securities, LLC, upon the successful consummation of the Transaction, not to exceed $2,200,000, (B) the $3,000,000

15

Termination Fee and the $500,000 Expense Reimbursement, and (C) $500,000 (the "**Minimum Bid Amount**");

(v)    **Irrevocability of Bid**.  A letter stating that the Potential Bidder's offer is irrevocable until the first business day after the Assets for which the Potential Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court;

(vi)    **Bid Deposit**.  A cash deposit in the amount of $3,000,000 (the "**Bid Deposit**") by wire transfer, certified or cashier's check, which amount shall be made payable to the Debtors;

(vii)    **Identification of Executory Contracts and Unexpired Real Property Leases**.  The bid shall identify with particularity the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks to receive an assignment and any designation rights it seeks;

(viii)    **No Financing or Diligence Constituencies**.  The bid shall not contain any due diligence, financing or regulatory contingencies of any kind, though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing;

(ix)    **Consent to Jurisdiction**.  The bid shall state that the offering party consents to the jurisdiction of the Bankruptcy Court;

(x)    **Corporate Authority**.  The bid shall include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted asset purchase agreement of the Potential Bidder; and

(xi)    **Adequate Assurance Information**.  The bid shall include sufficient financial or other information (the "**Adequate Assurance Information**") to establish adequate assurance of future performance with respect to any lease or contract to be assumed and assigned to the bidder in connection with the proposed transaction. The bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.

In addition, the bid must satisfy the other requirements set forth under "Bid Requirements" in the Bidding Procedures.

A "**Qualified Bidder**" is a Potential Bidder that delivers the documents described in subparagraphs (i)-(xi) above, and that the Debtors determine is reasonably likely (based on

16

financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors) to be able to consummate a sale if selected as the Winning Bidder. Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder. Not later than two (2) business days after a Potential Bidder delivers all of the materials required by subparagraph (i)-(xi) above, the Debtors shall determine and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. A bid from a Qualified Bidder is a "**Qualified Bid**."

- **Overbid Amount and Minimum Bid Increment**. There shall be an overbid amount that a Qualified Bidder must bid to exceed the bid of the Stalking Horse Bidder, and that amount shall include a cash payment at closing that is not less than the sum of (A) the consideration set forth in Section 3.1 of the Stalking Horse Agreement, which includes, but is not limited to, the Success Fee, as defined in the Stalking Horse Agreement, payable directly to Duff & Phelps Securities, LLC, in an amount not to exceed $2,200,000, plus (B) a cash payment equal to the Break-Up Fee and the Expense Reimbursement payable directly to the Purchaser at the Closing, plus (C) cash payment of $500,000. Subsequent bids at the Auction shall not provide consideration of less than $250,000 in excess of the preceding bid subject to the Debtors ability to adjust the bidding increments in accordance with the Bidding Procedures.

- **Auction**. If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtors, the Debtors may conduct an auction (the "**Auction**") with respect to all or some of the Assets. The Auction shall be conducted at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801 (the "**Auction Site**") at a date and time determined by the Bankruptcy Court (the "**Auction Date**"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

- **Break-Up Fee and Expense Reimbursement**. To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into the Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to provide certain bid protections to the Stalking Horse Bidder, under the conditions outlined herein and in the Stalking Horse Agreement, including (i) a break-up fee in an amount of $3,000,000 and (ii) reimbursement of reasonably documented actual out-of-pocket expenses in an amount not to exceed $500,000, both of which, if approved by the Bankruptcy Court, shall be paid in accordance with the Stalking Horse Agreement.

C.      **Break-Up Fee, Expense Reimbursement and Transition Services Agreement**

28.      In order to provide an incentive and to compensate the Stalking Horse Bidder for entering into the Stalking Horse Agreement, the Debtors have agreed to the Bid Protections, including the Break-Up Fee and Expense Reimbursement.

29.      The Debtors believe that offering the Bid Protections to the Stalking Horse Bidder will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. The availability of the Bid Protections is necessary in order to provide the Stalking Horse Bidder with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Assets and the risk that arises from participating in the bidding and subsequent Auction process.

30.      Additionally, pursuant to Sections 4.2 and 4.3 of the Stalking Horse Agreement, at Closing, the Debtors and Purchaser shall enter into a transition services agreement (the "**TSA**"), in substantially the form of Exhibit E to the Stalking Horse Agreement for transition services as requested by Purchaser and agreed to by the Debtors.

D.      **Notice of Bidding Procedures, Auction and Sale**

31.      *Notice of Sale Hearing*.  On the date the notice of motion and hearing with respect to this Motion is filed, the Debtors (or their agents) shall serve this Motion and all exhibits hereto, including the Stalking Horse Agreement, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, upon (a) the United States Trustee for the District of Delaware; (b) the Debtors' pre-petition and post-petition lenders or their agents; (c) the creditors listed on the Debtors' consolidated list of 20 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (f) each of the Debtors' landlords and each of the notice

18

parties identified in the real property leases; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that have been identified by the Debtors or their advisors as a potential purchaser of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency; (l) local, state and federal authorities and agencies that have issued licenses or permits to the Debtors with respect to the operation and use of the Purchased Assets; and (m) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").

32.    *Notice of Sale*.    Within five (5) business days of the entry of the Bidding Procedures Order (the "**Mailing Date**") or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a sale notice (the "**Notice of Auction and Sale Hearing**") setting forth the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Schedule 2**, upon the Sale Notice Parties.

33.    *Post-Auction Notice*.    As soon as possible after the conclusion of the Auction, the Debtors shall file, but not serve, a notice (the "**Post Auction Notice**") identifying any winning bidder (the "**Winning Bidder**").

E.    **The Cure Procedures**

34.    The Debtors propose the following procedures (the "**Cure Procedures**") for notifying counterparties to Executory Contracts and Real Property Leases of potential Cure Amounts (as defined below) with respect to those Executory Contracts and Real Property Leases that the Debtors may seek to assume and assign on the Closing Date.

RLF1 10339783v.4

35.     Within five (5) business days of the entry of the Bidding Procedures Order, the Debtors will file a notice of potential assumption, assignment and/or transfer of the Executory Contracts and Real Property Leases listed therein (the "**Designated Executory Contracts**"), substantially in the form attached to the Bidding Procedures Order as **Schedule 3** (the "**Notice of Assumption and Assignment**") and serve such notice on all non-debtor parties to the Designated Executory Contracts (the "**Contract Notice Parties**").

36.     The Notice of Assumption and Assignment shall identify whether each Designated Executory Contract is a Purchased Asset and the calculation of the cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under the Designated Executory Contracts (the "**Cure Amounts**") as of such date (the "**Cure Date**").  The Notice of Assumption and Assignment shall also contain information regarding how a non-debtor party to an Executory Contract or Real Property Lease may obtain adequate assurance of future performance information from the Stalking Horse Bidder (the "**Stalking Horse Adequate Assurance Information**").  The Notice of Assumption and Assignment shall set a deadline by which the non-debtor party may file an objection to the Cure Amount or the Stalking Horse Adequate Assurance Information.  The Debtors request that this Court set the deadline to object to any Cure Amount or to the Stalking Horse Adequate Assurance Information as fourteen (14) days after service of the Notice of Assumption and Assignment.  The Debtors propose that if they file an amended Notice of Assumption and Assignment identifying additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to Purchaser not set forth in the original Notice of Assumption and Assignment, or setting forth amended Cure Amounts, any parties affected by the amendment shall have fourteen (14) days after service of the amended Notice of Assumption and Assignment to object to the amended Cure Amount.  The

Notice of Assumption and Assignment shall also provide that objections to any Cure Amount or to the Stalking Horse Adequate Assurance Information will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors in consultation with the Court. In the event that the Winning Bidder is not the Stalking Horse Bidder, the Debtors propose that any objections regarding adequate assurance of future performance may be raised at the Sale Hearing.

37.    The Debtors or the Purchaser may determine to exclude any Designated Executory Contract (an "**Excluded Contract**") from the list of Purchased Assets no later than the 21st day prior to the Sale Hearing. The non-debtor party or parties to any such Excluded Contract will be notified of such exclusion by written notice mailed within one (1) business day of such determination.

38.    At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Winning Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any or all Executory Contracts and Real Property Leases to be assumed and assigned on the Closing Date to any Winning Bidder. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

## APPLICABLE AUTHORITY

39.    "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the

RLF1 10339783v.4

Debtors demonstrate a sound business justification therefore.  See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

40.    As discussed above, the Debtors have sound business justifications for selling the Assets at this time.  After critical analysis, the Debtors concluded that their forecasted revenues were insufficient to adequately fund both the Debtors' business operations and their debt service requirements.  Thus, following consultation with their advisors, the Debtors determined that, given their overly leveraged financial position and their conclusions about the valuation of the Debtors' business, the most effective way to preserve the Debtors' going concern value for the benefit of creditors was through a sale of the Debtors' assets following a thorough marketing process.  A sale of the Debtors' assets will result in the transfer of the business on a going concern basis to a financially stable buyer that will be able to satisfy the Debtors' going-forward capital requirements.  Accordingly, the Debtors submit that the proposed sale will enable them to both address their liquidity issues and maintain customer confidence in the marketplace.  Until these issues are addressed, however, the Debtors believe that the value of the business could erode.  Accordingly, a sale consistent with the timeframe proposed herein is necessary to maximize the value of their Debtors' assets for the benefit of all creditors in these Chapter 11 Cases.

A.    **The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Assets**

41.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The Debtors believe that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.

22

The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures will provide the Debtors with the opportunity to consider all competing offers and to select the highest or best offer for the sale of substantially all of the Assets.

42.    The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

**B.    The Bid Protections Are Necessary to Preserve the Value of the Debtors' Estates**

43.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the Bid Protections to the Stalking Horse Bidder will likely maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

44.    Approval of the Bid Protections to the Stalking Horse Bidder is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527,

537 (3d Cir. 1999) (hereinafter, "O'Brien"); see also Reliant Energy Channelview LP v. Kelson Channelview LLC, 594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "Reliant"). Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Reliant, 594 F.3d at 206-07; O'Brien, 181 F.3d at 537.

45.     The O'Brien court reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

A.     the presence of self-dealing or manipulation in negotiating the break-up fee;

B.     whether the fee harms, rather than encourages, bidding;

C.     the reasonableness of the break-up fee relative to the purchase price;

D.     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

E.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

F.     the correlation of the fee to a maximum of value of the debtor's estate;

G.     the support of the principal secured creditors and creditors committee of the break-up fee;

H.     the benefits of the safeguards to the debtor's estate; and

I.     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

46.     The Break-Up Fee and Expense Reimbursement set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Assets and to therefore

24

insist that competing bids be materially higher or otherwise better than the Stalking Horse Agreement — a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse without the Break-Up Fee and Expense Reimbursement. Without the Break-Up Fee and Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest or best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at Auction for the Assets could be substantially lower than that offered by the Stalking Horse Bidder.

47.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Bid Protections are compensation for the Stalking Horse Bidder's investment of considerable time and expense in negotiating and entering into the Stalking Horse Agreement. The Debtors do not believe the Bid Protections will stifle bidding. To the contrary, the Debtors believe that, should an auction be held, the Bid Protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662. If the Assets are sold to a competing bidder, the sale likely will be the result of Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

48.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of

the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id.

49.    Here, the Break-Up Fee is equal to $3,000,000. When considered together with the Expense Reimbursement up to $500,000, such amounts represent approximately 3.5% of the aggregate $100,000,000 Purchase Price consideration, which is consistent with the range of bid protections typically paid in sale transactions that have been approved by this Court. Given the size of the Purchase Price, the Debtors believe the amount of the Bid Protections is appropriate.

C.    **Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

50.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Banter. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bonier. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

26

51.    The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action").

52.    The Debtors have a sound business justification for selling the Assets at this time. Based on a careful view of the Debtors' liquidity constraints and their ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that an expedited Sale of all of the Assets in accordance with the procedures set forth in the Bidding Procedures is the best method to maximize recoveries to the estates.   Maximization of the Assets' value is a sound business purpose warranting authorization of any proposed Sale.  For the reasons discussed herein, the Debtors believe that an expedited sale of the Assets is the best way to maximize value for the benefit of creditors and stem any further deterioration of the going concern value of the company.

53.    The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their business for the benefit of the Debtors' estates and their creditors.  The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

54.     For the reasons outlined above, the Debtors believe that their entry into the Stalking Horse Agreement and other ancillary documents is a sound exercise of their business judgment and supported by the facts and circumstances of these Chapter 11 Cases.

55.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and their creditors and parties-in-interest.

## D.     The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests

56.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

57.     The Debtors believe that their prepetition lenders will consent to the sale free and clear under section 363(f)(2). In the event they do not, a sale free and clear can proceed pursuant

to section 363(f)(5) of the Bankruptcy Code because the prepetition lenders will be paid from the proceeds of the Sale and the Debtors will establish at the Sale Hearing that the prepetition lenders can be compelled to accept a monetary satisfaction of their claims.

58.     The Debtors propose that any bona fide and allowed Interests shall attach to the Sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Assets prior to such Sale.

**E.     A Winning Bidder Should be Entitled to the Protections of Section 363(m)**

59.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. See In re Abbotts Dairies, 788 F.2d at 147; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain V. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

60.     The Stalking Horse Agreement was negotiated at arm's length, with all parties represented by their own counsel.  Additionally, the Debtors will adduce facts at the Sale Hearing demonstrating that any bidder who is deemed a Winning Bidder for all of the Assets had negotiated at arm's length, with all parties represented by their own counsel.

61.     Accordingly, the Sale Order will include a provision that the Winning Bidder for the Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing any Winning Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and that closing of the Sale will occur promptly.

**F.     The Assumption and Assignment of Executory Contracts and Unexpired Leases**

62.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3rd. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). Any more exacting scrutiny would slow the administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

63.    Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

RLF1 10339783v.4

64.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

65.    Additionally, information will be included in the Notice of Assignment and Assumption as part of the Stalking Horse Adequate Assurance Information, which will include contact information on where adequate assurance information can be obtained. Adequate assurance of future performance with respect to any Winning Bidder who is not the Stalking Horse Bidder shall be presented at the Sale Hearing. Upon closing, the Stalking Horse Bidder will have financial resources that are more than sufficient to perform under any Executory Contracts or Real Property Leases it seeks to have assumed by the Debtors. Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating the financial wherewithal of the Stalking Horse Bidder or any Winning Bidder, and their willingness and ability to perform under the Executory Contracts and Real Property Leases to be assumed

and assigned to it. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Winning Bidder to provide adequate assurance of future performance under the Executory Contracts and Real Property Leases that it seeks to assume.

66.    Accordingly, the Debtors respectfully submit that the procedures proposed herein for Executory Contracts and Real Property Leases being assumed and assigned on the Closing Date are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Notice of Assignment and Assumption of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

67.    Furthermore, to the extent that any defaults exist under any Executory Contract or Real Property Lease that is to be assumed and assigned in connection with the Sale of the Assets, the Winning Bidder will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such Executory Contract or Real Property Lease.

68.    Accordingly, this Court therefore should have a sufficient basis to authorize the Debtors to assume and assign Executory Contracts and Real Property Leases as may be set forth in any Winning Bidder's asset purchase agreement.

G.    **Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

69.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

70.    The Debtors shall serve a copy of this Motion by first class mail upon: (a) the United States Trustee for the District of Delaware; (b) the Debtors' pre-petition and post-petition lenders or their agents; (c) the creditors listed on the Debtors' consolidated list of 20 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (f) each of the Debtors' landlords and each of the notice parties identified in the real property leases, to the extent possible; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that has been identified by the Debtors or their advisors as a potential purchaser of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency; (l) local, state and federal authorities and agencies that have issued licenses or permits to the Debtors with respect to the operation and use of the Purchased Assets; and (m) all parties requesting notice pursuant

to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that

no further notice is required or needed under the circumstances.

## NO PRIOR REQUEST

71.    No prior motion for the relief requested herein has been made to this Court or any

other Court.

*[Remainder of page intentionally blank]*

RLF1 10339783v.4

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, (A) approving the Bidding Procedures; (B) approving the Break-Up Fee, Expense Reimbursement and other Bid Protections; (C) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (D) approving the Cure Procedures; and (E) granting such other and further relief as this Court deems appropriate. Additionally, the Debtors request that at the Sale Hearing, this Court enter a Sale Order, subject to the result of the Auction and to the Bidding Procedures, (A) approving and authorizing the Sale; (B) authorizing the assumption and assignment of certain Executory Contracts and Real Property Leases; (C) authorizing the Debtors to enter into a transition services agreement as contemplated by the Stalking Horse Agreement; and (D) granting such other and further relief as this Court deems appropriate.

Dated:  June 16, 2014
      Wilmington, Delaware

Respectfully submitted,

John H. Knight (No. 3848)
Paul N. Heath (No. 3704)
Tyler D. Semmelman (No. 5386)
Amanda R. Steele (No. 5530)
William A. Romanowicz (No. 5794)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email: knight@rlf.com
     heath@rlf.com
     semmelman@rlf.com
     steele@rlf.com
     romanowicz@rlf.com

*Proposed Counsel for Debtors and Debtors in Possession*

RLF1 10339783v.4